IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BRAD AVAKINA, COMMISIONER OF
OREGON BUREAU OF LABOR AND
INDUSTRIES, ex rel FAIR HOUSING
COUNCIL OF OREGON,

       Plaintiff,                                         Case No. 6:13-cv-1776-MC

    and,                                                  OPINION AND ORDER

FAIR HOUSING COUNCIL OF OREGON,

      Plaintiff-Intervenor,

      vs.

CHANDLER APARTMENTS, LLC fka
L&T CHANDLER, LLC, an Oregon
Limited Liability Company, et al.,

      Defendants.
_____

1 – OPINION AND ORDER

MCSHANE, Judge:

Plaintiff Brad Avakian, Commissioner of Oregon Bureau of Labor and Industries (BOLI), and plaintiff-intervenor Fair Housing Council of Oregon (FHCO), collectively referred to as "plaintiff," move for partial summary judgment against defendant Chandler Apartments, LLC, fka L&T Chandler, LLC, and Oregon Limited Liability Company (Chandler Apartments).[1] Plaintiff brings three claims under the Fair Housing Act (FHA) and its Oregon counterpart. Plaintiff alleges Chandler Apartments discriminated against prospective tenants based on their disabilities and failed to provide reasonable accommodations. As discussed below, defendants provided only a token defense with no basis in law.[2] As it is clear that Chandler Apartments violated the FHA, plaintiff's motion for summary judgment, ECF No. 75, is GRANTED.

## BACKGROUND[3]

In 2010, defendant James Tarantino purchased the Chandler Hotel with Melvin Lesher, a business partner. Built in 1908, the Chandler Hotel is on the National Register of Historic Places. Tarantino Decl., ¶ 2. Tarantino and Lesher formed L&T Chandler LLC to refurbish the hotel and operate it as Chandler Apartments. Tarantino then purchased Lesher's interest through a corporation of which Tarantino is the president.

In May 2011, Tarantino allowed an acquaintance by the name of Steve Lyons to live at the Chandler Apartments in exchange for work. Lyons had asked Tarantino to allow him to live

---

[1] Other defendants include dissolved entities and entities created by defendant James Tarantino—the sole member and manager of Chandler Apartments—after the events at issue. Chandler Apartments and 1031, INC. are the only defendants to answer the amended complaint. The history of the various entities is described in a stipulation of the parties. *See* ECF No. 74. Although it is clear that Tarantino and Chandler Apartments are nearly synonymous, this opinion generally distinguishes between those two defendants.

[2] After I granted plaintiff's motion for summary judgment, nearly two months after the deadline to respond, and without requesting leave to file, defendants filed a "Post-Hearing Memorandum of Additional Authority in Opposition to Motions of Plaintiffs for Summary Judgment. *See* ECF No. 97. This response comes far too late and is denied as untimely.

[3] As this is the plaintiffs' motion for summary judgment, I construe all facts in the light most favorable to defendants, the non-moving parties.

2 – OPINION AND ORDER

at the Chandler Apartments "for free for a brief time as a friend, in exchange for which Lyons would keep an eye on things and answer the business phone during times when [Tarantino] was away in California." Tarantino Decl., ¶ 3. The two agreed Lyons was neither an employee nor a manager of the Chandler Apartments. Tarantino authorized Lyons "to show apartments to prospective tenants and provide them with tenancy applications if they asked for them, but was not allowed to make any decisions either accepting or rejecting applications." *Id*. Lyons would simply forward completed applications to Tarantino, who retained sole authority to accept or deny the applications. Lyons was not authorized to amend or vary the applications, which authorized no pets other than service animals. *Id*. Tarantino also authorized Lyons to speak to prospective tenants and provide information about renting at the Chandler Apartments. Nov. 7, 2014 Aldworth Decl., Ex. 4. Lyons was listed as "On-site manager" on at least some documents provided to tenants of Chandler Apartments. Aldworth Decl., Ex. 5, 2.

In September 2011, two FHCO "testers" called Chandler Apartments posing as prospective renters.[4] Tester Alpha called the Chandler on September 23, 2011 and spoke with "Steve" about renting an apartment. Alpha Decl., Ex. A, 1. After Steve provided information about the available apartments, Tester Alpha stated "Just so you know, I have a therapy animal." *Id*. Steve stated, "Ok, I'd have to check with the actual owner, I'm just the interim manager." *Id*. Steve said Tester Alpha could come look at the apartment or call back.

Tester Alpha spoke with Steve again on September 28. Tester Alpha asked if the owner was available and whether Steve spoke with the owner about the service animal. Steve said, "I already talked to the owner, and he does not want dogs in the building." Alpha Decl., Ex. A, 6.

---

[4] FHA "testers" contact apartment complexes and inquire about vacancies. Despite having no interest in renting an apartment, testers attempt to determine if the landlord is violating the FHA.

Tester Beta called on September 30 and also spoke with "Steve" who described himself as a friend of the owner's, filling in until the owner found new management. Beta Decl., Ex. A, 1. After discussing the rentals, Tester Beta said, "I should probably let you know that I have an assistance dog." *Id*. Steve said, "I don't think they will let people have animals." Tester Beta stated she had a note from her doctor and Steve said, "I could say something, not [sic] I'm too sure. Somebody else brought that up. I don't think they allow that." Beta Decl., Ex. A, 1.

In his declaration, Lyons states:

3. In the course of my job answering the phone at the Chandler, I received a call from an individual who stated that he had a service animal and asked if he could rent a unit at the Chandler. I told the caller that I needed to check with the owner.

4. I informed Tarantino that I had received a call from a person who wanted to know whether he could rent a unit with a service animal. Tarantino informed me that no animals—whether service animals or not—were allowed at the Chandler. A few days later, the person called back, and I told him that the owner does not want any animals in the building, including service animals.

5. Thereafter, I received additional calls from individuals specifically inquiring whether they could rent at the Chandler if they had a service animal. I informed each caller that the owner did not allow any animals, including service animals.

6. All of the work that I performed at the Chandler was at the direction and control of Tarantino.

Lyons Decl. ¶¶ 3-6. Tarantino states Lyons never asked him about allowing service animals:

I have maintained the L&T Chandler LLC policies prohibiting smoking and pets. The no-pets policy does not apply to service animals and never has. I have never told anyone, including Steve Lyons, that disabled tenants of The Chandler may not keep service animals. . . . In all of the time I have been involved in the ownership of The Chandler, I have never received or heard of an application from a disabled potential tenant to move in with a service animal. If a tenant or prospective tenant could document an actual disability, they would be free to bring a genuine service animal into their apartment and keep it there.

Tarantino Decl., ¶ 6.

Tarantino notes he previously allowed a service animal to stay with a tenant. Tarantino states the smell of cat urine and feces ultimately led to the loss of a business tenant, costing him $20,000 in rent. Tarantino Decl., ¶ 5.[5]

Tarantino believes this action is part of a "fraudulent prank" dreamed up by Lyons and Sax, a former manager of the Chandler Apartments. Tarantino Decl., ¶ 3. Around Christmas of 2011, several months after Lyons's interactions with the testers, he and Tarantino had a falling out and Tarantino ordered Lyons to move out. *Id*. Lyons moved out two months later. As discussed below, even assuming that this is a "fraudulent prank," Chandler Apartments cannot avoid liability as it is clear Lyons had, at the very least, apparent authority to make the discriminatory statements to prospective tenants. It is also clear Lyons's statements violated the FHA and the corresponding Oregon statutes.

## STANDARDS

The court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it could affect the outcome of the case. *Id*. The court reviews evidence and draws inferences in the light most favorable to the non-moving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine issue for trial."

---

[5] While this could enhance Tarantino's credibility before a jury, it does not insulate defendants from liability under the FHA. *See Harris v. Itzhaki*, 183 F.3d 1043, 1053 (9th Cir. 1999) (fact an apartment complex is somewhat integrated does not insulate landlord from violations of the FHA).

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (quoting Fed. R. Civ. P. 56(e)).

## DISCUSSION

Plaintiff moves for summary judgment on three claims under the FHA and corresponding Oregon statutes making it unlawful to: make a statement connected with the rental of a dwelling indicating any preference, limitation, or discrimination based on handicap (42 U.S.C. § 3604(c) and ORS 659A.145(3)); refuse to make reasonable accommodations when reasonable accommodations may be necessary to afford such person equal opportunity to use or enjoy a dwelling (42 U.S.C. § 3604(f)(3)(B) and ORS 659A.145(2)(g)); and discourage any person from inspecting or renting a dwelling because of handicap (24 C.F.R. § 100.70(c)(1) and ORS 659A.145(2)(d)).

## I. Lyons's Statements Violated the FHA

Defendants' response fails to address plaintiff's legal arguments and the uncontradicted evidence in the record. Instead, Chandler Apartments generally holds firm to its position that there can be no discrimination here because "FHCO is not representing or acting on behalf of any **actual** disabled person with any **actual** service animal." Resp. 14 (emphasis in original). Defendants acknowledge the "noble heritage" of using testers as "a powerful tool to prove discrimination" in FHA cases. Resp. 13. Curiously, in the next sentence, defendants state, "In contrast, what happened here is that two people were paid to lie that they were prospective tenants of The Chandler, knowing that it had a no-pets policy." *Id*. Defendants go so far as to argue that a jury should be allowed to conclude that the fact that testers go through training and are compensated for completed tests is a form of extortion because it is the "payment of professional liars to manufacture false claims of discrimination[.]" *Id.*at 14.

6 – OPINION AND ORDER

The valid use of testers in FHA cases is settled law despite the incredulity of the defense in this matter. Although this action involves a claim under § 804(c) of the FHA, the Supreme Court discussed testers in case involving § 804(d):[6]

> A tester who has been the object of a misrepresentation made unlawful under § 804(d) has suffered injury in precisely the form the statute was intended to guard against, and therefore has standing to maintain a claim for damages under the Act's provisions. That the tester may have approached the real estate agent fully expecting that he would receive false information, and without any intention of buying or renting a home, does not negate the simple fact of injury within the meaning of § 804(d).

*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373-74 (1982). Additionally, "under the FHA the plaintiff need not allege that he or she was a victim of discrimination." *Harris v. Itzhaki*, 183 F.3d 1043, 1049-50 (9th Cir. 1999). To have standing under the FHA, a plaintiff need only suffer "a distinct and palpable injury" from a defendant's discriminatory conduct. *Id.* at 1050 (citation omitted). As discussed in *Harris*:

> Under the [FHA], any person harmed by discrimination, *whether or not the target of the discrimination*, can sue to recover for his or her own injury. *See Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 212, 93 S. Ct. 364, 34 L. Ed. 2d 415 (1972). "This is true, for example, even where no housing has actually been denied to persons protected under the Act." *San Pedro Hotel*, 159 F.3d at 475-76 (upholding standing of hotel owners in suit alleging that the City interfered with the rights of the mentally ill); *Smith v. Stechel*, 510 F.2d 1162, 1164 (9th Cir. 1975) (real estate agent fired for renting apartments to minorities allowed to sue under the Act).

183 F.3d at 1050 (emphasis in original). For an organization like FHCO to demonstrate standing, it must demonstrate "a drain on its resources from both a diversion of its resources and frustration of its mission." *Fair Housing Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012). The Executive Director of the FHCO provided a

---

[6] As relevant here, there is no difference in the analysis between the two subsections. § 804(c) makes it unlawful to make any statement indicating a preference or discrimination based on handicap. § 804(d) makes it unlawful to represent to any person based on handicap that a rental is unavailable when it is in fact available.

declaration, unchallenged by defendants, providing standing. *See* McGuire Decl., ¶ 5 (FHC "suffered a concrete injury to the organization's mission of eliminating housing discrimination through enforcement and education. Additionally, FHCO plans future expenditures in the Coos Bay area for remedial education and outreach, which further frustrates the organization's mission."). To the extent Chandler Apartments argues there was no harm and no victim in this instance, that argument fails.

Defendants also argue "The 'testers' failed to communicate information identifying themselves as disabled within the meaning of the regulation, or identifying their imaginary pets as service animals." Resp. at 11. That this argument ignores undisputed evidence in the record does not prevent defendants from repeating it. *See Id.* at 13-14 ("They did not communicate any information to the volunteer answering the telephone that would give fair notice that they were anything more than potential renters who had pets that they wanted to bring with them; they neither described themselves as disabled nor identified their imaginary pets as real service animals."). Defendants repeated this mantra at oral argument, arguing the testers did nothing other than request Chandler Apartments allow pets in the apartments. This argument, however, relies on a distortion of the undisputed evidence in the record.

First, Lyons's declaration makes clear he understood the requests related to reasonable accommodations for "service animals," not "pets." Lyons Decl., ¶¶ 3-5. Additionally, Lyons's declaration aligns with the reports of the two testers, completed shortly after the calls to Chandler Apartments. Despite repeated statements in briefings and again at oral argument that the testers never specifically mentioned "service animals," the testers' reports, which defendants do not contradict, show otherwise. In Tester Alpha's second call to Lyons, the tester specifically asked if Lyons spoke with the owner about the tester's "service animal." Alpha Decl., Ex. A, 6. Tester

8 – OPINION AND ORDER

Alpha previously informed Lyons that he had "a therapy animal." *Id.* at 1. Tester Beta informed Lyons she had "an assistant dog" and a note from her doctor. Beta Decl., Ex. A, 1.

At oral argument, defendants attempted to shift the burden from the landlord to the prospective tenant. Defendants argued the prospective tenant must: (1) specifically state he has a disability; (2) specifically state he has a service animal; and (3) specifically request an exception to any no-pets policy. In support of this argument, defendants read long portions of an April 23, 2013 HUD notice explaining obligations of landlords with regard to assistance animals under the FHA. *See* FHEO Notice: FHEO-2013-01; ECF No. 94-1, 1.[7]

Despite focusing on "service animals" (while ignoring that Tester Alpha specifically inquired about his "service animal"), defendants ignore HUD's note that "Assistance animals are sometimes referred to as 'service animals,' 'assistive animals,' support animals,' or 'therapy animals.'" *Id.* at 2 n.4. Defendants also ignored the specific reference in HUD's notice that the burden to inquire further is on the landlord, not the prospective tenant. This clarification, coming one paragraph below the section defendants quoted extensively at oral argument, states:

> A housing provider may not deny a reasonable accommodation request because he or she is uncertain whether or not the person seeking the accommodation has a disability or a disability-related need for an assistance animal. Housing providers may ask individuals who have disabilities that are not readily apparent or known to the provider to submit reliable documentation of a disability and their disability-related need for an assistance animal. If the disability is readily apparent or known but the disability-related need for the assistance animal is not, the housing provider may ask the individual to provide documentation of the disability-related need for an assistance animal.

*Id.* at 3.

There is no genuine issue of material fact that Lyons's statements to the testers were: discrimination based on handicap in violation of 42 U.S.C. § 3604(c) and ORS 659A.145(3); a

---

[7] HUD interpretations of the FHA are entitled to *Chevron* deference. *Meyer v. Holley*, 537 U.S. 280, 287-88 (2003).

refusal to make reasonable accommodations in violation of 42 U.S.C. § 3604(f)(3)(B) and ORS 659A.145(2)(g); discouraging any person from inspecting or renting a dwelling because of handicap in violation of 24 C.F.R. § 100.70(c)(1) and ORS 659A.145(2)(d). The testers' statements certainly put Lyons on notice that the testers were requesting reasonable accommodations for their assistance animals. Rather than request additional information from the testers, it is undisputed that Lyons told the testers in no uncertain terms that animals were not allowed at the Chandler Apartments. In this action involving clear violations of the FHA, the only question is whether defendants are liable for Lyons's statements.

## II. There is a Question of Fact Concerning Lyons's Actual Authority

Any questions as to the existence of an agency relationship under the FHA are determined under federal law, *Harris*, 183 F.3d at 1054 (citing *Cabrera v. Jakabovitz*, 24 F.3d 372, 386 n.13 (2d Cir. 1994)), which looks to the Restatement of Agency, *See Holley v. Crank*, 400 F.3d 667, 673 (9th Cir. 2005).

"Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Restatement (Third) of Agency*, § 1.01. In determining whether an agency relationship exists, courts look to all the factors and the terms employed by the parties are not controlling. *Id*. at § 1.02. Formal writings or spoken words are not required. That is, courts look to the conduct of the parties (and others) in determining intent or assent. *Id*. at § 1.03. "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." *Id*. at § 2.01.

10 – OPINION AND ORDER

If Tarantino told Lyons that no animals, including service animals, were allowed at the Chandler Apartments, this is an open and shut case. But Tarantino denies telling Lyons that disabled persons could not bring service animals to the Chandler Apartments. Tarantino Decl., ¶ 6. Principals, however, are often liable for unauthorized statements of their agents under the law of agency. *Cabrera*, 24 F.3d at 389 (quoting *Restatement (Second) of Agency*, § 216 comment a (1958)). To hold otherwise would make it too easy for a negligent principal "to plead ignorance when an agent was caught and it would be unfair to only punish a manager or agent for what the owner or employer should have controlled and trained the employee to avoid." *Id.* at 389 (citation omitted).

The facts here are similar to those discussed in *Harris*, where a landlord had an elderly tenant keep spare keys to the units, receive rent checks, show vacant apartments to prospective tenants, and provide rental applications to prospective tenants (with the landlord's contact information on the forms). 183 F.3d at 1047-48. The landlord did not pay the tenant for her assistance. A black resident overheard the tenant tell a gardener "The owners don't want to rent to Blacks." After testers found other inferences of racial discrimination (by the landlord and the elderly tenant), the resident brought an action under the FHA. Much like the case here, the landlord in *Harris* did not dispute the statements, arguing instead that the elderly tenant was neither an agent nor an employee. *Id.* at 1054. The court concluded a jury could find the tenant was an agent of the landlord and that the statement was not a mere stray remark.

Here, there is a question of fact as to the scope of Lyons's authority and as to what actions a reasonable person in Lyons's shoes would have thought were authorized by Tarantino. Therefore, summary judgment is not appropriate on the question of whether Lyons had actual authority to make the statements. *See Harris*, 183 F.3d at 1054 ("the question of agency should

11 – OPINION AND ORDER

be submitted to the jury unless the facts are clearly insufficient to establish agency or there is no dispute as to the underlying facts.").

## III. Lyons Had Apparent Authority

At oral argument, despite the fact that plaintiff raised the issue in its briefing, defendants admitted not having addressed or even considered whether Lyons had apparent authority to make the statements to the testers. Defendants stated they might concede the issue. As it is not clear whether defendants in fact concede this issue, I turn to it now.

Lyons's statements to the testers violated the FHA. At the very least, Lyons had apparent authority to make the statements to the testers. "Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." *Restatement (Third) of Agency*, § 2.03. Tarantino admits authorizing Lyons to man the front desk, answer the phone, answer questions about apartments, and show apartments. Whether Lyons decided to pull a "fraudulent prank" on Tarantino is irrelevant to this analysis, which depends on the point of view of a reasonable third party. Apparent authority does not depend on any agency relationship and "[t]he definition [of apparent authority] thus applies to actors who appear to be agents but are not, as well as to agents who act beyond the scope of their actual authority." § 2.03 (comment a).

"Apparent authority . . . is created by a person's manifestation that another has authority to act with legal consequences for the person who makes the manifestation, when a third party reasonably believes the actor to be authorized and the belief is traceable to the manifestation." § 3.03. Tarantino's manifestation here is the act of putting Lyons behind the counter and authorizing Lyons to answer questions from prospective tenants about vacancies.

12 – OPINION AND ORDER

Vicarious liability flows to the principal through an agent acting with apparent authority. "A principal is subject to vicarious liability for a tort committed by an agent in dealing or communicating with a third party on or purportedly on behalf of the principal when actions taken by the agent with apparent authority constitute the tort or enable the agent to conceal its commission." § 7.08. These torts include fraudulent and negligent misrepresentations. *Id.* (comment a.) Comment b to § 7.08 deals nearly exactly with the scenario here:

> When an agent acts with apparent authority, the agent's motivation is immaterial to the legal consequences that the agent's action carries for the principal. Likewise, the fact that an agent's conduct is not in fact beneficial to the principal does not shield the principal from legal consequences. This is because apparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation made by the principal. . . . So to charge a principal is fair because it is the principal's manifestation that clothes the agent with the appearance of authority to act on the principal's behalf and that induces the third party reasonably to believe that the agent acts with actual authority.[]

> Apparent-authority doctrine thus focuses on the reasonable expectations of third parties with whom an agent deals. This focus is inapposite to many instances of tort liability. However, apparent-authority doctrine is operative in explaining a principal's vicarious liability when a third party's reasonable belief in an agent's authority to speak or deal on behalf of a principal stems from a manifestation made by the principal and it is through statements or dealings that the agent acts tortuously.

> A principal's liability under the rule stated in this section does not depend on whether the principal benefits from the agent's tortious conduct.

> **Illustrations:**

> 1. P Numismatics Company urges its customers to seek investment advice from its retail salespeople, including A. T, who wishes to invest in gold coins, seeks A's advice at an office of P Numismatics Company. A encourages T to purchase a particular set of gold coins, falsely representing material facts relevant to their value. T, reasonably relying on A's representations, purchases the set of coins. P is subject to liability to T. A is also subject to the same liability to T. []

2. Same facts as Illustration 1, except that A persuades T to pay cash for the coins and to leave the coins with A so that they may be safely stored by P Numismatics Company. A then absconds with both the coins and the cash paid by T. Same results.

As Chandler Apartments deliberately placed Lyons in a position to commit violations of the FHA, Chandler Apartments cannot avoid liability by arguing Lyons is simply a negligent or bad actor. While this may appear a harsh result at first glance, it is merely a balancing of which innocent party shall bear the burden of harm for the discriminatory acts: a landowner whose agent acted outside of its authority and instructions, or the potential renter. *See Walker v. Crigler*, 976 F.2d 900, 904-05 (4th Cir. 1992) (to prevent similar harms occurring in future, FHA requires innocent party "with the power to control the acts of the agent" to compensate innocent party injured by violations). The result is no different when a principal takes multiple affirmative actions aimed at preventing FHA violations, such as actively training and educating agents to avoid discriminating against apartment and home seekers. *See City of Chicago v. Matchmaker Real Estate Sales Center, Inc.*, 982 F.2d 1086, 1093-96 (7th Cir. 1992).

Because it is clear Lyons had apparent authority to bind Chandler Apartments, plaintiff's motion for summary judgment is GRANTED as to the FHA and corresponding state law claims.

## IV. Piercing the Corporate Veil

At oral argument, similar to several other seemingly crucial portions to the defense of this action, defendants admitted not addressing the issue of whether piercing the corporate veil is appropriate in this instance. Defendants argued that because Tarantino was a named defendant, the issue is moot. That may or may not be true. But assuming Lyons's actions only lead to liability for Chandler Apartments, it is clear that piercing the corporate veil is appropriate in this instance.

14 – OPINION AND ORDER

> When substantial ownership of all the stock of a corporation in a single individual is combined with other factors clearly supporting disregard of the corporate fiction on the grounds of equity and fairness, courts have been willing to apply the "alter ego" or instrumentality theory in order to cast aside the corporate shield and to fasten liability on the individual shareholder.

*Holley v. Crank*, 400 F.3d at 674-75 (quoting William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corps.*, § 41.35 at 666-668).

The November 6, 2014 stipulation of the parties describes the numerous entities that owned the actual apartment building throughout the years. ECF No. 74. There is no question that during the relevant times in question (March 12, 2011 on), Tarantino was the "alter ego" of the various entities. Tarantino personally managed the Chandler Apartments from March 12, 2011 until December 2013, when he hired a professional management firm to manage the apartments. Tarantino Decl., ¶ 4. Tarantino was the sole shareholder or member of the various entities.[8] At times, the apartment complex was transferred to new entities formed, managed, and owned by Tarantino, for no consideration at all. ECF No. 74, ¶ 10. Tarantino clearly attempted to shield himself from personal liability by moving the sole asset of Chandler Apartments in and out of various entities he controlled and managed. To the extent defendants did not waive or concede this issue, plaintiff's motion to pierce the corporate veil is GRANTED.

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

---

[8] At times, Tarantino's minor son who lives out of state was a shareholder. I granted the opposed motion to dismiss Tarantino's minor son at the outset of this action, as it was clear the minor was a shareholder in name only.

15 – OPINION AND ORDER

## CONCLUSION

Plaintiff's motion for summary judgment, ECF No. 75, is GRANTED. As discussed at oral argument, plaintiff shall provide a written status report no later than February 23, 2015. IT IS SO ORDERED.

DATED this 30th day of January, 2015.


<u>/s/ Michael J. McShane</u>
Michael McShane
United States District Judge

16 – OPINION AND ORDER